**Erika FLORES, Plaintiff,**

v.

**BUY BUY BABY, INC., Defendant.**

**No. 99 Civ. 4792(CM).**

United States District Court,
S.D. New York.

Oct. 25, 2000.

Jeffrey M. Bernbach, Bernbach Law Firm, New York City, for plaintiff.

David N. Wynn, Arent, Fox, Kintner, Plotkin & Kahn, P.L.L.C., New York City, for defendant.

MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S REQUEST FOR REINSTATEMENT AND FRONT PAY.

McMAHON, District Judge.

Plaintiff Erika Flores was fired by defendant Buy Buy Baby, Inc. ("BBB") on December 31, 1998. Flores claims that BBB discriminated against her on the basis of pregnancy in violation of the Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k), contained in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991, and the New York State Human Rights Law, N.Y.Exec. Law § 290 *et seq.* Defendant moves for summary judgment and dismissal of the claims, and moves in the alternative to strike plaintiff's request for equitable relief.

For the reasons discussed below, defendant's motion for summary judgement is denied, as is its motion to strike plaintiff's claim for relief.

## BACKGROUND

Flores was hired as a sales associate at the Buy Buy Baby store in Scarsdale, New York on August 24, 1998. At the time of her hire, plaintiff was pregnant, though she neither informed defendant of this nor was she physically showing. After being hired, Flores was assigned to work in the Scarsdale store's "center island" under the direct supervision of department manager Marianne LaBella–Lajos ("LaBella"). Plaintiff's duties included assisting customers, stocking merchandise, and taking occasional turns as gift wrapper, cashier or personal shopper. Among her responsibilities, customer service was paramount.

Flores began as a full-time employee, working approximately forty hours per week. Her weekly work schedule varied according to the department-wide schedule, which LaBella usually prepared on the Wednesday of the preceding week.

Like all new BBB employees, Flores was a probationary employee for the first ninety days of her employment. The Buy Buy Baby Human Resources Policies and Procedures Manual says:

> All new hires should be evaluated and reviewed after 90 days of continuous employment. This initial review should determine whether the employee has performedat[sic] an acceptable level and should move into regular employee status. Employees who have not performed at an acceptable level may be subject to termination.

(Bernbach Aff. at Exh. 4, at BBB0054.)

The decision whether a BBB employee successfully completes her probation rests with her department manager. It was thus up to LaBella to decide whether Flores should become a regular employee after 90 days. Plaintiff's probation period ended in late November, after which date she continued to work at BBB as a regular employee.

Sometime in November or December 1998, Flores informed LaBella that she was pregnant. She also told LaBella that she planned to work until January, or longer if possible, then take a leave to give birth, and eventually return to work.

Flores claims that LaBella's demeanor toward her changed after she revealed this information, becoming "very cold," not as "talkative as she used to be" and "very distant," causing plaintiff to believe "that there was something wrong." She says some of her co-workers noticed this shift in treatment. (Bernbach Aff. at Exh. 1, at 39–40) Flores also alleges that, after learning of the pregnancy, LaBella removed her

stocking responsibilities. LaBella denies the change in her feelings toward plaintiff, and also denies unilaterally reducing Flores' duties at any time after learning of her pregnancy.

Sometime after this conversation, Flores requested a reduction in her hours, from full-time to part time. Flores says she made the request "[b]ecause I felt that's what I wanted to do." (Id.) After consulting with assistant store manager Attilio Capparelli ("Capparelli"), LaBella agreed to the request the next day.

In early December, plaintiff asked LaBella for a two-week unpaid vacation. LaBella agreed, and she and Flores discussed the dates the vacation would cover. LaBella claims to have made a note of the dates in writing, although she no longer has her note. As LaBella, in conformity with the store's general practice, would not be preparing the work schedule for the week of plaintiff's return until after plaintiff had left on vacation, plaintiff claims to have arranged with LaBella to call in to the store the week before her return to learn her schedule for the following week. LaBella denies that she and plaintiff ever arrived at this arrangement.

On December 20, Flores began her vacation. On December 28, 1998, during the second week of her vacation, Flores telephoned the store and spoke with Lisa Friday ("Friday"). Friday told Flores that LaBella was off that day. Flores asked Friday what her schedule was. When Friday informed plaintiff that she was scheduled to work that very day, December 28, Flores replied that there was some mistake, as she was not yet due back from vacation. She told Friday to tell LaBella that she, Flores, would call LaBella when she returned to New York.

Flores alleges that she later called LaBella. The two of them disagreed about what the date plaintiff had given as the date of her return. LaBella denies this conversation ever took place.

When Flores returned to work on December 31, her next scheduled day, she was summoned to meet with LaBella and Capparelli. Prior to this, LaBella claims that she discussed plaintiff's absence with Capparelli and recommended that plaintiff be terminated. According to LaBella, she had decided to discharge plaintiff the day after Flores called Friday regarding her schedule. Capparelli fired Flores at the meeting. The termination notice read "Erika had said she needed time off from 12/20—12/27 and was on the schedule for the 28th. She did not come back until the 31st. Also, Erika's performance while she is here is not up to Buy Buy Baby's standards. Erika's employment is being terminated as of 12/31/98 due to her performance." (Bernbach Aff. at Exh. 4 at BBB0105.)

Plaintiff avers that she was never formally disciplined, nor was she warned, verbally or in writing, by LaBella or anyone else at defendant store, about any problems with her performance. Defendant disagrees. LaBella claims that she spoke with Flores about her customer service skills, and also says that, sometime during plaintiff's probation, she talked to Flores about leaning on the computer desk in the toy department when she should have been on the floor helping customers. When asked during discovery why she did not take formal disciplinary action, LaBella claimed she was being lenient.

According to LaBella, plaintiff's performance "got progressively worse" after the probationary period. For example, Flores would not smile or greet the customers or ask if they needed help. LaBella said she brought this to her superiors' attention, although she does not recall whether she spoke to Capparelli or the store manager, nor does she recall the substance of any conversation she may have had. There is no written record of any such conversation. Capparelli said LaBella spoke to him about plaintiff's problems. He noticed Flores was short with customers and didn't participate adequately in the store's nighttime

restocking efforts. Capparelli claims that he spoke to plaintiff on one occasion in an encouraging tone, although he can not remember what he said.

Plaintiff denies that LaBella, Capparelli, or any other manager at the store spoke to her concerning her conduct or demeanor. When asked whether LaBella ever told her that she needed to walk the floor and talk to customers, Flores said LaBella did not make those comments directly to her, but to her and other employees "as a group." (Clermont Suppl. Decl. at Exh. A at 52–53.) It is uncontested that, prior to her termination date, there was no record in plaintiff's file of any complaints, warnings, or disciplinary actions related to performance problems by the plaintiff. And of course, she was kept on after her probation ended.

Defendant's human resources manual requires that, prior to terminating an employee with performance or attendance problems, supervisors must give two warnings. No warnings are required to terminate employees within the probationary period. Disciplinary/termination notices provided by defendant show that, between November 11, 1997 and December 1, 1998, approximately twelve employees in (in addition to Flores) were fired at the Scarsdale store. Eleven of the twelve were probationary employees. The one regular employee who lost her job yelled profanities at a customer. Eleven employees were warned at least once about performance or attendance problems, and at least four of these were regular employees. (McHale Suppl. Decl. at Exh. B.)

Defendant claims that approximately eight other employees, including LaBella, completed their pregnancies while working at the Scarsdale store, and have since returned to work.

### DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate where the parties' submissions "show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, the court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In an employment discrimination case where, as here, the employer's intent is at issue, the court must be especially cautious about granting summary judgment. *See Gallo v. Prudential Residential Servs. Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir.1994). However, to defeat summary judgment, the non-moving party must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). For a plaintiff in a discrimination case to survive a motion for summary judgment, he or she must offer "concrete particulars" to substantiate the claim. *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985) *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

### II. The PDA

Flores brings this action against BBB for allegedly discriminating against her on the basis of pregnancy in violation of the PDA. The PDA provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e–2(h) of this title shall be interpreted to permit otherwise." 42 U.S.C. § 2000e(k). The elements of an employment discrimination claim are "virtually identical" under the New York Executive

Law and Title VII. *See Lacoparra v. Pergament Home Centers, Inc.*, 982 F.Supp. 213, 225 (S.D.N.Y.1997). Therefore, our analysis of plaintiff's Title VII claim is equally applicable to plaintiff's claim under New York Executive Law § 290 *et seq.*

Because Flores alleges discriminatory treatment in violation of Title VII, the Court applies the three-step burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In *McDonnell Douglas,* the Supreme Court established an "allocation of the burden of production and an order for the presentation of proof in Title VII cases." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993). Under this framework, plaintiff first establish a prima facie case of discrimination. Second, if plaintiff succeeds in proving the prima facie case, a presumption that the employer unlawfully discriminated against the employee is raised and the burden of production then shifts to the employer "to articulate some legitimate nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then demonstrate that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802, 804, 93 S.Ct. 1817). While the burden of production may shift, the burden of proving discriminatory intent remains always with the plaintiff. *See id.* at 253, 101 S.Ct. 1089; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993).

## A. *Plaintiff's Prima Facie Case*

A plaintiff can establish a prima facie case of pregnancy discrimination by showing that: (1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) her position remained open and was ultimately filled by a non-pregnant employee. *See Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.1995), *vacated and remanded on other grounds*, 166 F.3d 422 (1999). In the alternative, a plaintiff may satisfy the fourth element by showing that the discharge "occurred in circumstances giving rise to an inference of unlawful discrimination." *Id.* Plaintiff's burden to establish a prima facie case "is not onerous," *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981), and has been described as "minimal," *St. Mary's Honor Ctr.*, 509 U.S. at 506, 113 S.Ct. 2742.

It is undisputed in this case that plaintiff was a member of the protected class because she was pregnant, and that she was discharged. Defendant disputes, however, that plaintiff has made an adequate showing that she satisfactorily performed the duties required by the position, and that the circumstances of the firing give rise to an inference of discrimination.

█ For the purposes of the former inquiry, plaintiff need only show that she "possesses the basic skills required for performance of [the] job." *Powell v. Syracuse University*, 580 F.2d 1150, 1155 (2d Cir.1978). Flores worked for BBB for over three months as a customer service representative. She and her supervisors all admit that, while there, she helped customers, ran the register, and performed stocking and other duties. There is no written record of any complaints, disciplinary actions, warnings, or problems with respect to the plaintiff. And she was retained after her ninety-day probationary period. That meets plaintiff's burden of going forward concerning her performance on the job.

█ Furthermore, the circumstances of plaintiff's discharge are sufficient to give rise to an inference of discrimination. In November or December, just after she satisfactorily completed her probationary

period, Flores told LaBella of her pregnancy and her intention to take maternity leave in January or perhaps later. She was fired in late December. The temporal proximity of these events is adequate to raise an inference of discrimination. *See Klausner v. Industrial Risk Insurers, Inc.*, No. 98 Civ. 1267, 1999 WL 476285 (July 8, 1999, S.D.N.Y.)

### B. *Defendant's Non–Discriminatory Reason for Discharging Plaintiff*

■ The plaintiff having made out a prima facie case of pregnancy discrimination, the burden of production then shifts to defendant to offer a legitimate, nondiscriminatory reason for having fired her. Here, defendant asserts that its reason for discharging plaintiff was because she did not show up to work when she was scheduled, and because her job performance was deficient. This is sufficient to rebut the presumption of pregnancy discrimination raised by plaintiff's prima facie case. Accordingly, the burden returns to the plaintiff to show, by a preponderance of the evidence, that defendant's stated reason was pretextual.

### C. *Pretext for Pregnancy Discrimination*

■ To establish that BBB's proffered reason for discharging Flores's was pretextual, Flores must demonstrate through direct, circumstantial, or statistical evidence that BBB's reason was false and that it was more likely that BBB discharged her because she became pregnant. *See Gallo*, 22 F.3d at 1226. Unlike the minimal burden of establishing a prima facie case of discrimination, once the defendant has proffered a neutral rationale for the employment action, the factual inquiry proceeds to a new level of specificity. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 502, 516, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). However, "a plaintiff's prima facie case, combined with suffi-

cient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products, Inc.*, —— U.S. ——, ——, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000).

■ Here, plaintiff contends that a combination of five factors: (1) the temporal proximity between Flores' revelation that she was pregnant and the decision to terminate her employment; (2) plaintiff's successful transition from probationary employee to regular employee without warning, formal complaint or termination; (3) lack of any written evidence of defendant's failure to adequately attend to customer needs, either during probation or afterwards; (4) defendant's refusal to hear her side of the vacation-scheduling story;[1] (5) and defendant's failure to issues warnings to Flores prior to termination, coupled with evidence that other employees accused of similar performance problems did receive such warnings before termination, raises an issue of fact concerning defendant's motive that must go to the jury. Plaintiff is correct.

Defendant's claim that Flores performed poorly conflicts with its failure to warn her or terminate her at the end of her probationary period. In *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 39 (2d Cir.1994), the Second Circuit found that defendant's failure to discharge the plaintiff or a number of months, during which he was allegedly performing poorly, was inconsistent with its claim of poor performance, thereby indicating the presence of pretext and rendering summary judgment inappropriate. Furthermore, in 1998 (the year plaintiff was fired), defendant did issue warnings to other of its floor salespeople who were not performing up to company standards. (McHale Suppl. Decl. at Exh. B.) "Departures from procedural regularity ... can raise a question as to the

---

1. Plaintiff describes the events as "[a]t best a misunderstanding seized upon by the defendant, at worst a set-up from the start...." (Pl.Mem at 3)

good faith of the process where the departure may reasonably affect the decision." *Zahorik v. Cornell University,* 729 F.2d 85, 93 (2d Cir.1984) (examining denial of tenured position).[2]

The key here is that plaintiff disputes the circumstances of the first reason for her termination, denies engaging in the behaviors that allegedly formed the primary basis for her termination, and denies ever having been verbally reprimanded, warned, or even spoken to about these behaviors. Plaintiffs are correct that this creates a material issue of credibility, resolution of which is the province of the jury. *See Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) (Assessment of credibility and choices between conflicting versions of events are matters for jury, not for court on summary judgement.).

The evidence submitted by plaintiff is sufficient for a reasonable jury to conclude that defendant's proffered reason for discharging Flores is a pretext for pregnancy discrimination. Defendant will have an opportunity to convince the jury that plaintiff failed to return to work on time, and that BBB's failure to follow its own disciplinary policies in this case does not necessarily mean that plaintiff was a stellar employee.

## III. Motion to Strike Plaintiff's Claims for Reinstatement and Front Pay

In addition to declaratory relief, compensatory and punitive damages, plaintiff seeks equitable and injunctive relief in the form of reinstatement and/or front pay. Defendant asserts that, even if she does prove discrimination, plaintiff is not entitled to relief beyond November 15, 1999. On this date, defendant learned through plaintiff's deposition testimony that plaintiff provided false information on her employment application.

Although they do not cite the Supreme Court's ruling in *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), defendant appears to be relying on that case. In *McKennon,* the plaintiff, during her final year of employment with the defendant, copied several confidential firm documents. Her stated motivation for doing this was an apprehension that she was about to be fired because of her age, and wanted to use the documents as "insurance" or "protection." *See id.* at 355, 115 S.Ct. 879. Defendant discovered plaintiff's perfidy after plaintiff's termination, during the discovery phase of her lawsuit which charged the defendant with violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* This conduct gave the defendant grounds for lawful termination. The Supreme Court, reversing a Court of Appeals decision that denied plaintiff any remedy and dismissed her case due to her misconduct, held that after-acquired evidence of wrongdoing that would have resulted in lawful termination does not preclude recovery under the ADEA.[3] However, the Court did find that an employee's misconduct was relevant to the remedies otherwise available under the statute.[4] After stating that proper remedial relief in after-acquired evidence cases must be worked out on a case by case basis, the Court stated "as a general rule" that neither reinstatement nor front pay is an appropriate remedy. *See McKennon,* 513 U.S. at 361–62, 115 S.Ct. at 886. In addition, the Court held that back-pay should be limited to salary lost from the date of the unlawful discharge until the

---

**2.** This fact alone is probably not sufficient to defeat summary judgment. *See Bucknell v. Refined Sugars, Inc.,* 82 F.Supp.2d 151, 158 (S.D.N.Y.2000).

**3.** Because the substantive, anti-discrimination provisions of the ADEA are modeled upon the provision of Title VII, *see Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985), the *McKennon* analysis is applicable to the instant Title VII case. *See, e.g., Manard v. Fort Howard Corp.,* 47 F.3d 1067 (10th Cir.1995)

**4.** The damages statute governing the ADEA, 29 U.S.C. § 626(b), is substantively similar to 42 U.S.C. § 2000e–5(g), which governs Title VII.

date the employer discovered the information which would have led to discharge on lawful grounds. *See id.*

McKennon further held that "[w]here an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of discharge." *Id.* at 362–63, 115 S.Ct. at 886–87. There remain material issues of relevant fact as to whether BBB would have fired Flores solely on the basis of her falsified employment application. Defendant's motion to strike plaintiff's claim for front pay and reinstatement is therefore denied.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is denied, as is its motion to strike plaintiff's claim for front pay and reinstatement.